**Beth Ann BROWN, By and Through her parents and next friends, Shelby and Sally BROWN**

v.

**The WILSON COUNTY SCHOOL BOARD.**

No. 3–89–0740.

United States District Court, M.D. Tennessee, Nashville Division.

April 17, 1990.

On Motion to Correct May 28, 1990.

---

Gary Buchanan, Brentwood, Tenn., for plaintiff.

Mike Jennings, Lebanon, Tenn., for defendant.

## MEMORANDUM

HIGGINS, District Judge.

This action was brought on September 25, 1989, by the plaintiff, Beth Ann Brown, seeking a review of the administrative finding on the issue of defendant's financial liability for the plaintiff's educational placement under the Education for All Handicapped Children Act.

On July 16, 18, and 20, 1989, the plaintiff's parents went before Administrative Law Judge J. Randall LaFevor to contest the individualized education program offered by the defendant and to establish the defendant's financial liability for the plaintiff's educational placement in the Fresh Approach Program on the Cedarbrook campus. The judge ruled that the plaintiff's behavioral treatment program at Cedarbrook was medical, not educational, in nature. The ruling relieved the defendant of financial liability for the Cedarbrook placement because school boards are only responsible for educational programs. The judge further ordered a continuation of the homebound education offered in the defendant's individualized education program, although no legal authority was cited to support his decision.

Before the Court are two motions for summary judgment filed pursuant to Rule 56, Fed.R.Civ.P. The plaintiff's first summary judgment motion was filed on November 29, 1989 (Docket Entry No. 2), on the issue of financial liability. As grounds for summary judgment, the plaintiff submits that there is no factual dispute regarding her present educational program. Rather, the plaintiff contends there is only a legal issue as to whether the program is medical or educational under the Act. The defendant responded to the plaintiff's motion on January 31, 1990 (Docket Entry No. 13). In its response, the defendant agreed with all facts submitted by the plaintiff regarding the Cedarbrook treatment program's content. However, the defendant asserted that summary judgment is precluded because factual disputes exist regarding whether the program was rejected due to expense and whether the program is medical or educational in nature.

In the alternative, the plaintiff filed a second motion for summary judgment on the issue of officer impartiality (filed January 26, 1990; Docket Entry No. 9). The plaintiff contends that the administrative law judge was partial because he was a candidate for juvenile court judge for Metropolitan Nashville and Davidson County. In the defendant's response filed on January 31, 1990 (Docket Entry No. 14), it is asserted that the plaintiff pleaded no facts proving partiality.

The Court's jurisdiction is based upon 20 U.S.C. § 1415(e)(2), which grants the district court authority to review the due process hearing decision regarding the plaintiff's educational placement.

For the reasons discussed below, the plaintiff's motion for summary judgment on the issue of liability is granted. Because there are no facts proving officer liability, the plaintiff's motion on the issue of impartiality is denied.

## I.

The plaintiff, Beth Ann Brown, is a twenty-one-year-old woman who suffered brain damage when she was born on March 9, 1969. She has a primary handicapping condition of serious emotional disturbance and a secondary handicapping condition of mental retardation. Her condition is aggravated by a severe behavioral disorder which causes bizarre, frightening and uncontrollable outbursts endangering both herself and others. These outbursts are unpredictable and can last for hours. The plaintiff's behavior includes ingestion of foreign objects, such as hairspray, thumbtacks and articles of clothing; head banging; public masturbation; assault; feces smearing; object throwing and window breaking.

The plaintiff's behavior rendered placement in mainstream educational facilities provided by the defendant, Wilson County School Board, impractical. Therefore, the plaintiff's parents and the defendant's special education personnel have worked together for years to find an appropriate individualized education program. The plaintiff has received educational services from the following institutions: Cumberland House Mental Health Program, Vanderbilt In–Patient Mental Health Program, Camelot Care Centers, Inc. in Kingston, Tennessee; Ridgeway Psychiatric Hospital in Oakridge, Tennessee; Devereaux Foundation and Mapleton Psychiatric Institute in Devon, Pennsylvania; Wallace School; Parthenon Pavilion Hospital and Vocational Rehabilitation Services in Gallatin, Tennessee. Although these are all reputable programs, none were successful in meeting the plaintiff's specific educational goals or improving the plaintiff's behavior. The plaintiff was either asked to leave each program due to her uncontrollable behavior or was withdrawn by her parents due to lack of progress.

Since an effective residential program could not be found, the plaintiff's individualized educational program from September 17, 1987, to February 14, 1989, consisted of homebound instruction. From September 17, 1987, to January 25, 1989, the defendant provided three hours of homebound instruction per week, which was to be supplemented by vocational rehabilitation training. However, the plaintiff's disruptive behavior made participation in the vocational training impossible and such

training was discontinued. During the one and one-half years of homebound instruction on a three-hours-per-week basis, the plaintiff's behavior deteriorated markedly; and on January 25, 1989, the defendant modified the individualized education program to include five hours of homebound instruction per week.

In September of 1988, the plaintiff's parents learned of Cedarbrook's Fresh Approach Program. Cedarbrook is a residential rehabilitation facility in Gallatin, Tennessee, for brain injury victims. The Fresh Approach Program addresses significant behavior problems which interfere with a client's rehabilitation. The program provides basic living skills such as getting dressed, planning the day and properly eating meals. In addition, social skills enabling the client to successfully integrate into the community are taught.

Each client is provided an individualized care plan designed by his/her care team. The care team consists of the client, the parents, a doctor and therapists. These professionals assist the client in the areas of psychological counseling, behavior management, social skills, recreation, occupational skills, physical rehabilitation, art and speech. The care plan sets forth long and short-term goals. The ultimate program goal is to control the client's behavior so that the client may successfully function in a noninstitutional environment.

When the plaintiff's behavior became intolerable in the family home, her parents placed her in Cedarbrook on February 15, 1989. While at Cedarbrook, the plaintiff has made substantial progress in meeting her short-term care plan goals. Significantly, in 1989 her uncontrollable outbursts decreased from eight per month in February to zero by July. Furthermore, her attention span has increased from three minutes to 25–30 minutes per session.

In addition to behavior therapy, the plaintiff regularly sees two physicians at Cedarbrook. Dr. Clay visits for 15 to 20 minutes every two weeks. She also sees Dr. Lloyd "Roy" Brown for a "few moments" twice a month.

The plaintiff's placement was originally paid for by the insurance carrier of her father's employer. The original request for coverage was refused on the grounds that the services provided to the plaintiff at Cedarbrook were "educational". Subsequently, the father's employer arranged for insurance to pay placement expenses for two and one-half months. The plaintiff's parents have been fully responsible for all costs since May 1, 1989, when the coverage expired.

On May 25, 1989, the plaintiff's parents requested the Wilson County School Board to accept liability for the Cedarbrook Fresh Approach Program as an educational placement under the Education for All Handicapped Children Act. The defendant refused to pay for the program on the ground that Cedarbrook was a "medical" program for which it was not responsible. Instead, the defendant recommended a continuation of plaintiff's homebound individualized education program. At that time, the defendant further modified the individualized education program to provide homebound instruction five times per week for one and one-half hours per session.

## II.

■ Summary judgment is available in litigation under the Education for All Handicapped Children Act to avoid a possible waste of the court's time and resources. *Victoria L. v. District School Bd.,* 741 F.2d 369 (11th Cir.1984). Rule 56(c); Fed. R.Civ.P., provides that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The Court must view the facts in the light most favorable to the nonmoving party and hold the movants to their burden of conclusively proving that there is no genuine issue of material fact. *SEC v. Blavin,* 760 F.2d 706, 710 (6th Cir.1985); *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). Moreover, summary judgment "must be used only with extreme

caution," since it denies the litigant his day in court. *Blavin*, 760 F.2d at 710.

The disputed facts must be material and the dispute must be genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 275 (1986). The nonmovant cannot rely on allegations in the pleadings but must present more than a "scintilla of evidence" in its favor so that a jury could reasonably find in its favor. In other words, the inquiry is whether the evidence discloses a sufficient disagreement to present it to the jury or whether it is so one sided that the party will win as a matter of law. *Anderson*, 477 U.S. at 249–52, 106 S.Ct. at 2510–12, 91 L.Ed.2d at 212–14.

Summary judgment is appropriate as to the plaintiff's motion on the issue of liability because there is no genuine issue of material fact. No factual dispute exists regarding the services actually received by the plaintiff at Cedarbrook. The program "is what it is." Instead, the defendant raises a legal dispute regarding whether the services are defined as "educational" or "medical" under the Education for All Handicapped Children Act.

The defendant also argues that a genuine issue of material fact exists as to whether it rejected the Cedarbrook program on the basis of expense. However, the Court finds this argument does not preclude summary judgment because expense is not a material fact in this proceeding. Proof of financial motive is not an element of the plaintiff's case. The plaintiff is appealing the administrative law judge's finding that the Cedarbrook services are medical in nature, not whether the defendant wrongly rejected the program for expense reasons. Only facts which determine whether the Cedarbrook services constitute an appropriate education under the Act are material for summary judgment purposes.

## III.

The Education for All Handicapped Children Act was enacted in 1975 to "assure that all handicapped children have available to them ... *a free appropriate public education* which emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C. § 1400(c) (emphasis added). The state must provide the special education and related services to those in need regardless of the severity of the handicap. 20 U.S.C. § 1412(2)(C). Moreover, Tennessee law also requires local school systems to provide children with "special education services sufficient to meet the needs and maximize the capabilities of handicapped children." Tenn.Code Ann. § 49–10–101(a)(1) (1972).

The Act further defines a "free appropriate public education" to include "*special education and related services* which ... have been provided at public expense ... [and] in conformity with the individualized education program required under Section 1414(a)(5) of this title." 20 U.S.C. § 1401(a)(18)(A), (D) (emphasis added). "Special education" is defined as:

> specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, *including* classroom instruction, instruction in physical education, home instruction, and *instruction in hospitals and institutions*. (emphasis added)

20 U.S.C. § 1401(a)(16).

The Act also provides an extensive definition of "related services":

> The term 'related services' means transportation, and such developmental; corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, *except that such medical services shall be for diagnostic and evaluation purposes only* ) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children. (emphasis added)

20 U.S.C. § 1401(a)(17). Moreover, the Act provides that a free public education, including special education and related services, must be available to all handicapped children between the ages of three and twenty-one. 20 U.S.C. § 1412(2)(B). Tennessee law further requires that handicapped children be educated until age twenty-one. Tenn.Code Ann. § 49–10–102(1) (1972).

The Act is implemented through the "individualized education program" (IEP) which is mandated for each disabled child. The IEP is "[p]repared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child ... [T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 597, 98 L.Ed.2d 686, 699 (1988). *See* 20 U.S.C. § 1401(a)(19).

Congress recognized that parents would not always agree with the resulting IEP. Therefore, Congress incorporated an elaborate set of procedural safeguards to insure the full participation of the parents and the proper resolution of substantive disagreements. *Burlington School Comm. v. Department of Educ.,* 471 U.S. 359, 368, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385, 394 (1985). Whenever the local educational agency (school board) refuses to change the child's IEP, the child's parents or guardians must be given an opportunity to complain about any such matter. 20 U.S.C. § 1415(b)(1)(E). When a complaint is made, the parents or guardians are entitled to an impartial due process hearing conducted by a hearing examiner unrelated to the local agency involved in the case of the child, or by the state educational agency. 20 U.S.C. § 1415(b)(2). The Act further provides for judicial review of the due process hearing to state or federal court. The reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party,

and, basing its decision on a preponderance of the evidence, shall grant relief as the court determines appropriate." 20 U.S.C. § 1415(e)(2).

The Sixth Circuit has determined that a *de novo* standard of review is required, but that the district court should give due weight to the state administrative hearings in reaching its decision. *Doe ex rel. Doe v. Smith,* 879 F.2d 1340, 1343 (1989), *cert denied,* —— U.S. ——, 110 S.Ct. 730, 107 L.Ed.2d 749 (1990). *See also Roncker ex rel. Roncker v. Walter,* 700 F.2d 1058, 1062 (6th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).

## IV.

■ The following issues must be addressed for a complete review and analysis of the instant case: (1) whether the IEP proposed by the defendant provides an educational benefit to the plaintiff; (2) whether the Cedarbrook behavioral therapy program represents the appropriate educational program for which the defendant is liable until the plaintiff's twenty-first birthday; (3) whether compensatory education should be awarded to the plaintiff which extends the defendant's financial liability beyond the plaintiff's twenty-first birthday.

### 1. *The IEP Offered by the Defendant does not Provide Educational Benefits to the Plaintiff*

A district court reviewing an appeal brought under 20 U.S.C. § 1415(e)(2) must face the two-step inquiry mandated by *Board of Educ. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690, 712 (1982). The first step of the *Rowley* test is whether the state has complied with the Act's procedural requirements. *Id.* These requirements have been satisfied in the instant case. Second, the court must determine whether "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Id.* According to *Rowley,* in order to satisfy its duty to provide a free appropriate education, "a

state must provide personal instruction with sufficient support services to permit the child to benefit educationally from the instruction". *Id.* at 203, 102 S.Ct. at 3049, 73 L.Ed.2d at 710. The educational benefits do not have to maximize a child's potential, but must only offer a "basic floor of opportunity" which will allow the child to progress with his education. *Id.* at 201, 102 S.Ct. at 3048, 73 L.Ed.2d at 708.

With respect to the second requirement, the state administrative law judge did not cite any evidence that the proposed IEP confers any educational benefit. Rather than addressing benefits of the IEP, the administrative law judge focused on why the Cedarbrook placement was inappropriate. The judge held that the placement was medical because it "was made for a very legitimate purpose, to control the child's assaultive and aggressive behavior related to her brain injury". However, he cited no legal authority supporting his position that behavioral management does not have an educational component.

A careful review of the administrative hearing record reveals that the plaintiff deteriorated, rather than benefited, under the IEP, which consisted of three hours per week of homebound instruction from 1987 to 1989. Moreover, the Court finds it highly unlikely that the latest IEP, which offers seven and one-half hours of homebound instruction per week will offer any more benefit. Therefore, the IEP does not offer "a basic floor of opportunity" which enables the child to receive educational benefits and make progress.

### 2. *Cedarbrook Represents the Appropriate Educational Placement for which the Defendant is Liable*

The Supreme Court has held that a reviewing court may order school authorities to reimburse parents for private special education expenditures if the reviewing court ultimately determines that such placement, rather than the proposed IEP, is appropriate under the Act. *Burlington,* 471 U.S. at 370, 105 S.Ct. at 2003, 85 L.Ed.2d at 395. Therefore, since the proposed IEP does not confer an educational benefit under the *Rowley* standard, this court must determine if the current Cedarbrook placement represents the appropriate educational placement for which the defendant is financially liable.

The threshold issue in determining the appropriateness of the Cedarbrook placement is whether it is educational, or medical, in nature. The language of the Act is very broad and includes all of the services the plaintiff receives at Cedarbrook. The occupational therapy, psychological services, recreational therapy, physical therapy and medical evaluations provided by the Cedarbrook Fresh Approach Program are all specifically listed as "special education and related services" in the Act. 20 U.S.C. § 1401(a)(17). *See also* Tenn.Code Ann. § 49–10–102(4) (1972). The Act further provides that the aforementioned services are to be provided at no cost regardless of the severity of the handicap. 20 U.S.C. § 1412(2)(C).

The legislative history of the 1983 amendments to the Act reaffirm the Congressional intent of providing a broad definition of special education. Congress stated that "special education" shall meet the "unique educational needs" of handicapped children. It further clarified that "the term 'unique educational needs' be *broadly construed* to include the handicapped child's academic, social, health, emotional, communicative, physical and vocational needs." H.R.Rep. No. 410, 98th Cong., 1st Sess. 19 (1983), *reprinted in* 1983 U.S.Code Cong. & Admin.News 2088, 2106 (emphasis added).

Moreover, the courts have broadly construed special education to include more than traditional classroom education. The Supreme Court first broadly interpreted "education" under the Act in *Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690. As discussed previously, the Court in *Rowley* held that an educational placement must confer "some educational benefit upon the handicapped child." *Id.* at 200, 102 S.Ct. at 3047, 73 L.Ed.2d at 708. The Court recognized that the degree of educational benefit required under the Act depends upon the capabilities of the child.

"Benefits obtainable by children at one end of the spectrum will differ dramatically from those at the other end, with infinite variations in between." *Id.* at 202, 102 S.Ct. at 3049, 73 L.Ed.2d at 709.

A review of the circuit court decisions further reveals how special education goals vary according to the unique needs of each handicapped child. *Id.* The Third Circuit stated, "[w]here basic help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point." *Battle v. Pennsylvania,* 629 F.2d 269 (3d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). *See also Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 176 (3d Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989). Similarly, the First Circuit noted that Congress established a priority for severely retarded children and recognized that education may not consist of classroom training but rather training in very basic life skills. *Abrahamson v. Hershman,* 701 F.2d 223, 228 (1st Cir. 1983). *See also Timothy W. v. Rochester, N.H. School Dist.,* 875 F.2d 954 (1st Cir. 1989), *cert. denied,* — U.S. —, 110 S.Ct. 519, 107 L.Ed.2d 520 (1989).

Significantly, the Supreme Court has identified behavioral problems as a handicapping condition requiring special education under the Act. *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). In *Honig,* the Court noted that the student was unable to control his impulsive, aggressive behavior and that his "very inability to conform his conduct to socially acceptable norms [rendered] him 'handicapped' within the meaning of the Act." *Id.* at 320, 108 S.Ct. at 602, 98 L.Ed.2d at 705. *See* 20 U.S.C. § 1401(a)(1), 34 C.F.R. § 300.5(b)(8) (1987). *See also Clevenger v. Oak Ridge School Bd.,* 744 F.2d 514, 516 (6th Cir.1984).

Thus, the plaintiff's behavioral treatment program in the instant case is also educational. The goals set for the plaintiff at Cedarbrook specifically include only the benefits she can reasonably attain. Only after the plaintiff meets her basic educational goals to control her impulsive and aggressive behavior, may she proceed to more advanced educational goals. Significantly, the administrative law judge made that very point in his order when he stated that "[t]he child's primary current need is for mental health and medical rehabilitative treatment. *Until these needs are addressed, the child will be unable to appreciably benefit from educational services* greater than those offered by the School System ..." (emphasis added). The care plan conference reports "reveal dramatic progress" in meeting the basic goals of the Cedarbrook program. Thus, the plaintiff has received a definite educational benefit at Cedarbrook as defined by the Supreme Court in *Rowley* and the supporting circuit court opinions.

Furthermore, the defendant's reliance on *Irving Independent School District v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), to characterize the plaintiff's treatment as medical is misplaced. If anything, *Tatro* aids the plaintiff in the instant case. The Supreme Court held that a school nurse must provide clean intermittent catheterization to a handicapped child with spinal bifida as a "related service." *Id.* at 892, 104 S.Ct. at 3377, 82 L.Ed.2d at 892. Thus, the Court recognized that medical "related services" are necessary to provide meaningful access to education for handicapped children. However, the Court further held that a local educational agency is not required to provide the "medical services" of a *licensed physician* beyond purposes of "diagnosis and evaluation." *Id.* (emphasis added).

In the instant case, the plaintiff sees two physicians for a period of less than one hour per month. The administrative law judge relied heavily on the doctor visits to characterize the Cedarbrook placement as "medical". A review of Dr. Roy Brown's deposition reveals that he "sees her just a few moments like an office visit to see if she has any complaints or problems...." Furthermore, a doctor does not supervise her daily participation in the program.

Even if the plaintiff's doctors were to provide occasional medical treatment, the entire program would not be deemed medical. The claimed inextricability of medical and educational grounds for certain services does not provide the defendant with a basis for denying liability. "Rather, the unseverability of such needs is the very basis for holding that such services are a prerequisite for learning." *Kruelle v. New Castle County School Dist.*, 642 F.2d 687, 694 (3d Cir.1981). *See also North v. District of Columbia Bd. of Educ.*, 471 F.Supp. 136, 141 (D.D.C.1979) (Court enjoined school board from denying sixteen-year-old multiple-handicapped epileptic free placement in residential academic program because the social, emotional, medical and educational problems were so intertwined that it was "not possible for the court to perform the Solomon-like task of separating them").

The Court finds the testimony of Dr. Brown particularly helpful here. He stated that "[i]f you don't feel good, you can't benefit from what else is going on and basically I consider myself a foundation on which the other folks can work. If I can keep the patient feeling good and do what I can medically, to help control behavior, then they are going to be able to benefit from all these other things, and therefore get better." Therefore, the limited doctor visits to "monitor and adjust" the plaintiff's medication are a related educational service for diagnostic and evaluation purposes pursuant to 20 U.S.C. § 1401(a)(17). Accordingly, this Court finds that the plaintiff's behavioral treatment program at Cedarbrook qualifies as "special education and related services" under the Act.

Having deemed the plaintiff's current placement educational, the Court must now determine whether the plaintiff's residential placement at Cedarbrook is "appropriate" under the Act. The Sixth Circuit has ruled that the only appropriate placement for a child with aggressive, uncooperative behavior is one which "specifically takes into account and provides for this lack of cooperation." *Clevenger*, 744 F.2d at 516. The parents in *Clevenger* asserted that the only "free appropriate education"

for their emotionally disturbed son with a behavior disorder was an expensive residential, long-term facility with locked wards. The *Clevenger* court granted the parents' requested placement because the school's proposed IEP did not meet the "unique needs" to control the behavior of the handicapped child. *Id.*

Similarly, the Third Circuit upheld the parents' request for residential placement of their handicapped child over the proposed homebound IEP as the appropriate education in *Kruelle v. New Castle School Dist.*, 642 F.2d 687 (3d Cir.1981). In *Kruelle*, the handicapped child was profoundly retarded with severe emotional problems which required 24–hour supervision. The school board asserted that a six-hour day of homebound instruction was sufficient to fulfill the school district's obligations. The court held that the child's "unique needs" required residential placement because "full time care" is necessary in order to allow Paul to learn." *Id.* at 694.

Likewise, in *Gladys J. v. Pearland Independent School Dist.*, 520 F.Supp. 869 (S.D.Tex.1981), the parents also successfully challenged an IEP under the Act and received a residential placement for their child. The school's IEP consisted of a six-hour day program for a multiple-handicapped child with severe language, learning and behavior impairments. The court agreed with the parents that a residential program was appropriate to meet the child's unique educational needs. The court noted that "Laura had made no significant progress [in the IEP placement] and is unlikely to make any progress in any educational placement that cannot provide her with a constant structured environment [and] a *24–hour behavioral modification program ....*" *Id.* at 877 (emphasis added).

Based upon a review of the record and the applicable law, the Court finds that the Cedarbrook placement is the only appropriate educational program in view of the plaintiff's disability. The plaintiff has made progress only at Cedarbrook because the care plan is designed to meet her unique educational needs. As in *Cleven-*

*ger, Kruelle,* and *Gladys J.,* discussed *supra,* the plaintiff requires a 24-hour behavioral modification program to learn.

Equally significant is how inappropriate the proposed IEP would be for the plaintiff's educational needs. The school authorities are incorrect in assuming that seven and one-half hours per week of homebound instruction may fulfill their educational objectives to the plaintiff. The record reveals that the plaintiff's condition worsened under the IEP. Moreover, the plaintiff's aggressive behavior was intolerable in the family home. Thus, the full-time, residential Cedarbrook program represents the only available "free appropriate public education" to which the plaintiff is entitled under the Act.

Since the Court has determined that Cedarbrook is the only appropriate placement for the plaintiff, the defendant must reimburse the plaintiff for expenditures on private placement at Cedarbrook from May 1, 1989, when the insurance payments ceased,[1] through March 9, 1990, when the plaintiff turned twenty-one years old. *Burlington,* 471 U.S. at 370, 105 S.Ct. at 2003, 85 L.Ed.2d at 395. "Reimbursement merely requires the [board] to belatedly pay expenses it should have paid all along...." *Id.* The defendant must reimburse the full amount without considering cost. "[C]ost considerations are only relevant when choosing between several options, all of which offer an 'appropriate' education. When only one is appropriate, then there is no choice." *Clevenger,* 744 F.2d at 517.

3. *The Defendant is not Required to Provide Compensatory Education*

■ Although the retroactive reimbursement is appropriate, the Court declines to award the plaintiff compensatory education at Cedarbrook for the time she received homebound instruction.[2] Other circuits have awarded compensatory education beyond the handicapped child's twenty-first birthday for years spent in an inappropriate education program where the school board's actions denied a child access to what the court ultimately determined to be the appropriate educational placement. "Compensatory education, like retroactive reimbursement, is necessary to preserve a handicapped child's right to a free education. Without it, the child's right [to a free education] would depend on his or her parent's ability to fund the education during the years of administrative proceedings and federal court litigation." *Jefferson County Bd. of Educ. v. Breen,* 853 F.2d 853, 857–58 (11th Cir.1988). *See also Miener ex rel. Miener v. Missouri,* 800 F.2d 749, 753 (8th Cir.1986).

■ However, the facts of the instant case do not merit such relief. Neither the plaintiff nor the defendant were aware that the Cedarbrook program existed until September, 1988. Moreover, the defendant did not refuse to accept financial liability for the Cedarbrook placement until the parents' request on May 25, 1989, after the plaintiff had been at Cedarbrook for three months. Thus, compensatory education is not warranted because the defendant's actions did not deny the plaintiff access to Cedarbrook during her two years of homebound instruction from 1987 to 1989.

V.

Therefore, the Court makes the following findings on the issue of liability: (1) The plaintiff is not required to participate in the IEP offered by the defendant because it does not confer any educational benefit; (2) the defendant is financially responsible for the Cedarbrook expenditures until the plaintiff's twenty-first birthday and must retroactively reimburse the plain-

---

1. Plaintiff's limited insurance coverage for the Cedarbrook program has no bearing on the educational-medical distinction. The federal regulations clearly contemplate that insurance companies may be obligated to pay for some of the services required by the Act. 34 C.F.R. Section 300.301(b) (1989).

2. Although the plaintiff's summary judgment motions did not specifically request compensatory education, the plaintiff's complaint filed September 25, 1989, did request compensatory education. Therefore, the Court, having reviewed the entire record, will address the issue for a complete resolution of the case.

**446**

tiff because Cedarbrook offers the only appropriate education option; and (3) the plaintiff is not entitled to compensatory education.

The administrative law judge's holding that the Cedarbrook program was medical in nature and his order to continue the homebound individualized education program are reversed. Accordingly, the plaintiff's motion for summary judgment on the issue of liability is granted.

The Court denies the plaintiff's alternative summary judgment motion on the issue of hearing officer impartiality. The plaintiff has not proved the lack of impartiality on the part of the administrative law judge. Rather, the plaintiff's motion rests on unsupported conjecture that the officer was biased because he was a candidate for juvenile court judge. Thus, the motion is denied.

An appropriate order will be entered.

### ON MOTION TO CORRECT

Before the Court is the plaintiff's motion (filed March 3, 1990; Docket Entry No. 28) to correct a clerical mistake in the Court's order entered April 18, 1990 (Docket Entry No. 26). The plaintiff's eligibility for a free appropriate education under the Education for All Handicapped Children Act will terminate at the end of the school year in which she turns twenty-two, pursuant to Tenn.Code Ann. § 49–10–102(1) (1988).

Thus, the Court's memorandum, order and judgment (Docket Entry Nos. 25, 26 and 27, respectively) are modified to reflect that the defendant shall retroactively reimburse the plaintiff for the Cedarbrook program expenses from May 1, 1989, through the conclusion of the school year, June 1991. The Court adheres to the remaining portions of the memorandum, order and judgment which shall remain unchanged and in full force and effect.

The Clerk is directed to enter judgment accordingly.

It is so ORDERED.